IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 10, 2023

**STATE OF TENNESSEE v. KESEAN DEWAYNE HALL**

**Appeal from the Criminal Court for Davidson County**
**No. 2019-D-2480    Steve R. Dozier, Judge**

_____

**No. M2022-01176-CCA-R3-CD**

_____

The Defendant, Kesean Dewayne Hall, appeals his jury convictions for second degree murder, attempted second degree murder, employing a firearm during the commission of or attempt to commit a dangerous felony, and criminal trespass. For these convictions, he received an effective thirty-five-year sentence. On appeal, the Defendant challenges (1) the denial of his motion to sever the separate shooting episodes; (2) the sufficiency of the convicting evidence; (3) the admission of video footage showing the Defendant trespassing on the housing development's property; and (4) the admission of "video evidence related to Crime Scene 3." He also raises a claim of cumulative error and a challenge to his sentence. Following our review, we conclude that due to inadequacies in the Defendant's appellate brief, all of his issues are waived save sufficiency of the evidence. First, relative to the sufficiency of the evidence, we conclude that the evidence was insufficient to support the Defendant's criminal trespass conviction, and that conviction must be reversed and dismissed. Next, the evidence's being sufficient to support the Defendant's remaining convictions for second degree murder, attempted second degree murder, and employing a firearm during the commission of or attempt to commit a dangerous felony, those convictions are affirmed. The case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed in Part; Reversed in Part; Case Remanded**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Nicholas McGregor and Jay A. Umerley (on appeal and at sentencing and motion for new trial hearings); and Wesley B. Clark and F. Michie Gibson, Jr. (at trial), Nashville, Tennessee, for the appellant, Kesean Dewayne Hall.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Chandler Harris and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

This case involves three separate shootings that occurred inside or near Cheatham Place housing development in Nashville, Tennessee, during the evening hours of March 16, 2017. Cheatham Place housing development is operated by the Metropolitan Development and Housing Agency ("MDHA"). The Davidson County grand jury, on July 24, 2017, returned a nine-count indictment against the Defendant and Hollis Eugeno Harbison, III (case number 2017-C-1586), based upon their alleged participation in these shootings. The indictment charged them both with first degree premeditated murder of Keith King (count one); attempted first degree murder of Darius Fite (count two); employing a firearm during the commission of or attempt to commit a dangerous felony (counts three and four–separate counts for each defendant); aggravated assault of Nicholas Goodner (count five); reckless endangerment of "individuals in the alley between 841 Garfield and 843 Garfield" (count six); unlawful possession of a weapon (count eight); and aggravated criminal trespass (count nine). Tenn. Code Ann. §§ 39-12-101, -13-102, -13-103, -13-202, -14-406, -17-1307, -17-1324. Codefendant Harbison, solely, was charged with evading arrest (count seven). *Id*. § 39-16-603.

Chronologically, the first shooting, involving count six, took place at approximately 7:30 p.m. in an alleyway of the Cheatham Place housing development that ran between Delta Avenue and Garfield Street. The first incident was captured on MDHA surveillance cameras, and the defendants can be seen firing handguns in the direction of a group of individuals near the Garfield Street end of the alleyway. The second shooting, involving counts one through four, occurred at approximately 8:17 p.m. when the defendants allegedly shot at a car occupied by Mr. Fite and Mr. King as the car was traveling through the same MDHA alleyway before turning left onto Garfield Street. Mr. King suffered a gunshot wound to the back and died as a result of his injuries. Subsequently, in a photographic lineup, Mr. Fite positively identified codefendant Harbison as one of the shooters and partially identified the Defendant as the other. The third shooting, involving count five, took place at approximately 9:02 p.m. on 9th Avenue North in front of Buena Vista Elementary School, which was about two blocks away from the alleyway where the first two shootings occurred. This time, the defendants allegedly fired at a group of

individuals that included Mr. Goodner. The third shooting was also captured on video from an MDHA surveillance camera that faced the direction of the elementary school. Codefendant Harbison fled the scene but was captured soon after in possession of a Springfield XD 9-millimeter handgun.

The defendants filed a motion to sever the charges into three different groups, claiming that each set of charges involved a distinct criminal episode. Following a July 26, 2019 hearing on the motion, the trial court entered an order granting the defendants' motion in part by severing the charge of reckless endangerment (count six) from the remaining counts in the indictment. First, the trial court, analyzing Tennessee Rule of Criminal Procedure 14, determined that all of the offenses were part of the same criminal transaction such that they were part of a common scheme or plan. However, the trial court did not find that the evidence of each offense would be admissible in a trial of the others. Though identity was likely to be an overriding issue in these incidents, the trial court, analyzing Rule 404(b), determined that count six would be tried alone because identity was clear in the first incident given the video footage of the shooting and because the probative value of proof of the second and third incidents in a trial of the first would be outweighed by the danger of unfair prejudice.

The court determined that the remaining counts could be tried together because proof of each incident would each be admissible in a trial of the others and because the danger of unfair prejudice did not outweigh the probative value of the evidence of the other incidents. In making the probative value determination, the trial court noted that the defendants' involvement in the third incident would be probative in a trial of the second incident because shell casings from codefendant Harbison's weapon were linked to both scenes and because the recovered video from the third incident showed two individuals firing handguns in a location close to the second incident approximately forty-five minutes after that incident. Then, the trial court found that the probative value of proof of the third incident in a trial of the second was not outweighed by its prejudicial effect because Mr. Fite's positive identification of codefendant Harbison and tentative identification of the Defendant and because the linkage between the shell casings at the scenes of the two shootings were "highly probative" of the Defendant's identity. The court further indicated that proof of the first incident would be admissible in a trial of the second and third incidents because proof of the codefendants' involvement in the first incident was relevant as to the material issue of identity in the second and third incidents and because the proof established both defendants' involvement in the first incident by clear and convincing evidence.

On October 21, 2019, a superseding ten-count indictment was issued against both defendants (case number 2019-D-2480). In this indictment, the defendants were charged with first degree premeditated murder of Mr. King (count one); first degree felony murder of Mr. King (count two); attempted first degree murder of Mr. Fite (count three); employing a firearm during the commission of or attempt to commit a dangerous felony (counts four and five–separate counts for each defendant); aggravated assault of Mr. Goodner (count six); reckless endangerment of "individuals in the alley between 841 Garfield and 843 Garfield" (count seven); unlawful possession of a weapon (count nine); and aggravated criminal trespass (count ten). Codefendant Harbison was again separately charged with evading arrest (count eight). A minute entry from November 6, 2019, indicates that case number 2017-C-1586 was dismissed at the request of the State.

Due to subsequent events, the defendants' cases were served. They were tried separately.

Immediately prior to the Defendant's trial, the State chose to nolle prosequi counts six and nine, the offenses of aggravated assault of Mr. Goodner and unlawful possession of a weapon. In accordance with the trial court's earlier ruling, the reckless endangerment count was severed. Because the defendants were now being tried separately, count eight—codefendant Harbison's evading arrest charge—was not applicable to the Defendant's case. Accordingly, the indictment was renumbered before it was read to the jury, and the following five offenses charged against the Defendant remained: first degree premeditated murder of Mr. King; first degree felony murder of Mr. King; attempted first degree murder of Mr. Fite; employing a firearm during the commission of or attempt to commit a dangerous felony; and aggravated criminal trespass.

At trial, the State adduced the following evidence. At approximately 8:30 p.m. on March 16, 2017, Metropolitan Nashville Police Department ("MNPD") Officer Kevin Frei responded to a "shots fired call" at 1617 Arthur Avenue, the location where Mr. King was found suffering from a gunshot wound. It was dark outside. By the time Officer Frei had arrived on the scene, other officers and emergency personnel were already present. He and two other officers—MNPD Officers Brian Manning and Ashton Hill—were directed to go to an alleyway inside Cheatham Place, an MDHA public housing development situated in north Nashville, the location "where they believed the shots originated from." Officer Frei confirmed that the Cheatham Place housing development was equipped with surveillance cameras that were motion-activated.

These officers proceeded to the entrance of an alleyway inside Cheatham Place near 1592 Delta Avenue; the alleyway "ran in a little C-pattern between" Garfield Street and

- 4 -

Delta Avenue. Upon investigation, the officers found multiple cartridge casings, both in the alleyway and on the grass, and they found a shoe "kind of in the middle of alley[.]" The officers secured the scene by taping off the area and activating their patrol cars' blue lights to keep other cars from entering the alleyway. As they waited for "an ID unit" to arrive, they saw additional gunfire. Officer Frei said he saw what appeared to be "two guns . . . shooting[] kind of at each other from across the courtyard," approximately one-hundred feet from where he stood. Officer Frei retrieved a rifle from his police car and headed toward the location of the gunfire.

Officer Manning said that he also saw "two groups of gunfire going towards each other" from across the courtyard. Officer Hill noticed a set of "muzzle flashes" on 9th Avenue North next to the Cheatham Place main office building.

When the gunfire ended, Officer Manning focused on the individual on the left of the exchange and saw that he was a Black male who was wearing all black, with a "real thick white stripe" down both pant legs. Officer Hill spotted the individual "walking from 9th down to Delta across the courtyard" and alerted Officer Manning, who relayed the information over his radio to the other officers in the area. According to Officer Hill, once police cars turned onto Delta Avenue, the individual started running.

Officer Frei said that as he "ran up Delta a little bit further" and turned a corner into one of the alleyways, he observed the individual matching the description "banging on a door, trying to get into a building." Officer Frei detained the man, later identified as codefendant Harbison, on the back steps of 1528 9th Avenue North. Officer Frei said that he was able to find codefendant Harbison within a minute of receiving Officer Manning's description over the radio.

When Officer Frei searched codefendant Harbison's person, he found a loaded, semiautomatic Springfield XD 9-millimeter handgun and two additional magazines, one of which was empty. Ultimately that evening, codefendant Harbison was charged with reckless endangerment, aggravated criminal trespass, and "a weapons law violation." Officer Frei explained that codefendant Harbison was charged with aggravated criminal trespass because "[h]e was on MDHA property, armed, and he wasn't supposed to be there. He had no residence there. He had no one with him saying he was supposed to be there, and he also didn't have a valid carry permit."

MNPD Detective Nicholas Kulp learned that there was a gunshot victim at 1617 Arthur Avenue and arrived on the scene at approximately 8:45 p.m. Shortly after 9:00 p.m., Det. Kulp heard "a bunch of" gunshots. Det. Kulp remained at 1617 Arthur Avenue

while other law enforcement officers went to investigate the gunshots. Though Mr. King had already been transported to the hospital prior to Det. Kulp's arrival, Det. Kulp spoke with the initial responding officers and a couple of witnesses who had been "following the car" in which Mr. King had been riding and were still present on the scene. Those witnesses indicated that Mr. Fite was in the car with Mr. King when he was shot, so Det. Kulp went to speak with Mr. Fite. At 10:12 p.m., Det. Kulp arrived at Mr. Fite's mother's house, which was a couple of miles away from Cheatham Place, and spoke with Mr. Fite for thirty to forty minutes about the events of that evening.

Mr. Fite, who was sixteen years old at the time of shooting, provided the following version of events at trial. Mr. Fite said that on March 16, 2017, his nephew, Mr. King, called and asked Mr. Fite to bring him a jacket and give him a ride home. Mr. Fite took his mother's white four-door Dodge Stratus and drove to Monroe Park, near Cheatham Place, to transport Mr. King. After Mr. King got inside his car, Mr. Fite turned into an alleyway that went through Cheatham Place and headed toward "the store." As they were coming to the end of the alleyway, Mr. Fite noticed two men on the right side of the sidewalk, approximately five to ten feet away from his car. According to Mr. Fite, the men raised their guns and "just start[ed] shooting" at the car. Mr. Fite turned left out of the alleyway, and as he drove away, Mr. King said, "I'm hit."

Mr. Fite indicated that "a couple of minutes after the shooting[,]" he stopped the car and called 911. Mr. Fite said that Mr. King, at some point, "opened the door and rolled out" of the car. Mr. Fite tried to help Mr. King, who was having difficulty breathing. Mr. Fite's brother arrived on the scene and helped Mr. Fite with Mr. King. Mr. Fite said that he "rolled [his car] up the street" "trying to get an ambulance[,]" but his car had a flat tire and the engine had stopped working. Mr. Fite called his father, who picked him up and took him to his mother's house.

The recording of Mr. Fite's 911 call was played for the jury. At 8:22 p.m., Mr. Fite informed the operator that his nephew had been shot, emphasized the urgent nature of his call, and pleaded for an ambulance to arrive quickly.

According to Mr. Fite, he did not abandon Mr. King by moving to a different location because there were other individuals on the scene by then who were helping Mr. King. Mr. Fite said that he did not return to Mr. King because he "was too in shock" and was unable to see his nephew in that condition. Mr. Fite indicated that prior to his departure, someone informed him that an ambulance had arrived to help Mr. King.

Mr. Fite confirmed that only he and Mr. King were inside the car at the time of the shooting and that the car did not have any bullet strikes prior to that evening. He said that neither he nor Mr. King had a weapon that evening and insisted that they were not members of a gang called the "Rollin['] 40s." In addition, Det. Kulp confirmed at trial that Mr. Fite told him that no one else was inside the car that evening when Mr. Fite and Mr. King were fired upon.

From Det. Kulp's conversation with Mr. Fite at Mr. Fite's mother's house, Det. Kulp was able to determine that Mr. King had been shot inside the Cheatham Place housing development at the entrance to an alleyway near 841 Garfield Street. Det. Kulp was also able to ascertain the location of the car being driven by Mr. Fite at the time of the shooting. Around 11:00 p.m. that evening, the white Dodge Stratus was found parked on the side of the road near 10th Avenue North with a flat tire and visible bullet holes. According to Det. Kulp, this spot was "right down the street southbound going under the interstate overpass from the Arthur location" where Mr. King was found.

Det. Kulp, knowledgeable of the MDHA surveillance system, began to review video footage from Cheatham Place. As he watched, Det. Kulp saw numerous frames showing the defendants inside Cheatham Place. Det. Kulp eventually concluded that there had been three shootings over the course of one and one-half hours that evening—the first occurring near where the alleyway met Delta Avenue; the second, the one in which Mr. King was shot and killed, happening at the other end of that same alleyway where it met Garfield Street; and the third taking place slightly south of the general area around the alleyway in front of Buena Vista Elementary School.

Video related to the first shooting showed the Defendant and codefendant Harbison walking toward a red Dodge Charger parked on Delta Avenue before walking back and forth through the alleyway at 6:56 p.m. and 6:59 p.m., respectively. The Defendant wore a purple shirt, and codefendant Harbison wore a black and white jacket and striped pants. Codefendant Harbison was sitting on an alleyway post near the courtyard at 7:14 p.m. when the Defendant emerged and talked with him. At 7:15 p.m., the Defendant appeared as if he was talking on his cell phone. Three minutes later, the Defendant appeared to make or receive another phone call. Thereafter, the men walked back through the alleyway toward the Charger. At 7:20 p.m., codefendant Harbison walked away from the Charger, and the men appeared to exchange something. As they reentered the alleyway at 7:29 p.m. walking toward the courtyard, codefendant Harbison appeared to have a pistol in his right hand.

A car pulled into the alleyway from the Garfield Street entrance and parked toward that end of the alleyway. An individual appeared to exit the car and run across the

courtyard. At 7:30 p.m., codefendant Harbison fired his weapon at the person running. Codefendant Harbison stopped behind a concrete retaining wall and fired at the car parked at the other end of the alleyway. Around this time, the Defendant appeared on camera running toward the person in the courtyard. The Defendant also stopped and fired at the car. By this time, another individual had exited the car and was firing back at the defendants. At 7:31 p.m., the defendants returned to the Delta Avenue end of the alleyway before disappearing off camera. A minute later, the defendants reemerged and were standing on the opposite side of Delta Avenue, and the two appeared to exchange something. The Defendant went to the red Charger, unlocked the car, and reached inside the driver's side door as codefendant Harbison moved quickly back toward the alleyway entrance and fired another shot. The Defendant ran toward codefendant Harbison, and they proceeded to reenter the alleyway. At 7:33 p.m., codefendant Harbison fired more shots. Thereafter, they returned to the Charger and drove off.

Det. Kulp explained that no camera captured the second shooting that took place at the end of the alleyway at the Garfield Street entrance and which resulted in Mr. King's death. However, Det. Kulp did find footage of the white Dodge Stratus driving through the alleyway at 8:17 p.m. in the direction of Garfield Street. Det. Kulp indicated that Mr. Fite's 911 call was placed shortly thereafter.

The third shooting took place on 9th Avenue North in front of Buena Vista Elementary School shortly after 9:00 p.m. and was captured by a camera on the MDHA main office building. At 9:01 p.m., a group of individuals was walking northbound on 9th Avenue North in the direction of the school. Once in front of the school, several of the men crossed to the other side of the street and stopped at a parked blue car; one of the men got into the driver's seat of the car and conversed with the other two while the door was ajar. At that time, the defendants were walking down the sidewalk on 9th Avenue North on the same side of the street as the blue car. The defendants then stopped behind a sedan and truck parked on the street, and codefendant Harbison fired toward the car. The driver of the blue car closed the door and drove off. One of the men ran in the same direction as the blue car, running up the street and out of sight. The other man ran toward the school, and he appeared to shoot back as he ran. The Defendant, who was now in front of the MDHA main office building, returned fire at the man running in front of the school. Det. Kulp confirmed that this was the gunfire the officers heard while they were already on the scene investigating the shooting of Mr. Fite and Mr. King.

Det. Kulp learned that codefendant Harbison had been arrested just after the third shooting. Photographs of codefendant Harbison taken after his arrest showed that he was wearing striped pants. While codefendant Harbison was in custody, he called the

Defendant fourteen times. One call was made at 12:11 a.m. on March 17, 2017, and another was placed at 3:44 a.m. In the 12:11 a.m. call, codefendant Harbison told the Defendant that he had been arrested for trespassing because he "wasn't supposed to be over there in Cheatham."

Around 4:00 a.m. that morning, codefendant Harbison was released from booking. Det. Kulp, who happened to be in the parking lot at that time, saw the red Dodge Charger being driven by the Defendant. Det. Kulp recognized the Defendant as the same person he had seen in the surveillance footage, noting that the Defendant was wearing the same purple shirt. Before Det. Kulp could speak to him, the Defendant drove away. Det. Kulp was thereafter able to confirm the Defendant's identity through obtaining and viewing his driver's license records.

Around the time of codefendant Harbison's release, MNPD Detective Richard Ford saw codefendant Harbison exit the booking facility and walk toward Gay Street and take a right. Det. Ford also saw the red Dodge Charger leave the parking lot and also turn right on Gay Street. Det. Ford began to follow codefendant Harbison as he was walking and saw the red sedan driving slowly in front of codefendant Harbison. Both the Charger and codefendant Harbison then turned right onto 3rd Avenue North. As Det. Ford approached 3rd Avenue North, he saw the Charger, but codefendant Harbison was nowhere to be found. Det. Ford tried to follow the Charger, but he ultimately lost sight of the car after it sped over the Jefferson Street bridge. He estimated that the Charger was driving at least eighty miles per hour at that time. According to Det. Ford, the speed limit on the bridge was forty miles per hour.

Det. Kulp met with Mr. Fite again around 6:00 p.m. on March 17, 2017, this time at Mr. Fite's father's house. Det. Kulp had prepared two photographic lineups for Mr. Fite to view—one containing a photograph of the Defendant, and the other containing a photograph of codefendant Harbison. When Mr. Fite viewed the lineups, Mr. Fite was able to positively identify codefendant Harbison as one of the shooters, but he was only "70 percent" sure that the Defendant was the other shooter.

On March 17, 2017, Dr. Emily Dennison of the Nashville Davidson County Medical Examiner's office performed an autopsy of Mr. King's body. Dr. Dennison determined that Mr. King's cause of death was a gunshot wound and that the manner of death was homicide. Dr. Dennison said that Mr. King had been shot in the back and that the bullet traveled through his lung and heart before becoming lodged inside his chest. She was able to collect the projectile from Mr. King's front left chest cavity, and it was sent for testing.

Dr. Dennison notated in the autopsy report that she did not observe any soot or stippling associated with Mr. King's wound. At trial, she explained that medical examiners usually comment in the autopsy report whether soot or stippling were present on a gunshot wound in an effort to estimate the range of fire. She stated that if both soot and stippling were absent, as was the case here, then the weapon was fired at an "indeterminant range." Dr. Dennison expounded that this meant that the victim and shooter could have been anywhere between two feet to one hundred feet apart or there could have been an intermediary target between the two, if they were within two feet of each other, to absorb the soot and stippling. Dr. Dennison opined that she "wouldn't be surprised to know that" the bullet "had passed through something before" entering Mr. King's body because a bullet loses momentum when it hits an object and the bullet did not exit Mr. King's body. Dr. Dennison stated that she did not know the "quality [of] the ammunition" that killed Mr. King.

Dr. Dennison stated that she had no documentation that the MNPD requested a gunshot residue test in this case, but she noted that such tests were not often requested anymore. Det. Kulp explained that a gunshot residue test was used to show if someone had recently fired a weapon. According to Det. Kulp, a gunshot residue test was never requested for Mr. King's hands, and no such test was ever performed on Mr. King.

Lynette Mace with the MNPD Crime Scene Investigation Unit was the lead crime scene investigator in this case. According to Investigator Mace, the officers collected some bloodied clothing from the sidewalk at the Arthur Avenue location where Mr. King was found after being shot. At the second shooting location at the Garfield Street entrance to the alleyway where Mr. King was shot, twenty cartridge casings were found on or near the sidewalk. These cartridge casings were all 9-millimeter luger cartridge casings, but they were produced by four different manufacturers in total. At the elementary school scene, seventeen 9-millimeter luger cartridge casings and four .40 caliber Smith & Wesson cartridge casings were recovered. The 9-millimeter casings were found in the street and on the sidewalk near where the truck and sedan were seen parked in the video and also in the parking lot of the MDHA main office building. The two casings that were found in the middle of the road near the blue sedan where the three men from the group had stopped to converse were .40 caliber cartridge casings, as were the two casings found near the stairs in front of the school.

John Terry, also with the MNPD Crime Scene Investigation Unit, assisted in collection of the evidence at the first shooting scene that took place in the alleyway around 7:30 p.m. Near where the defendants were seen shooting on the video, Investigator Terry found four 9-millimeter luger cartridge casings to the right side of the alleyway and ten .40

caliber cartridge casings behind a concrete retaining wall and to the left side of the alleyway. About "a couple hundred yards" away, at the other end of the alleyway, he found seven .25 caliber cartridge casings near a car parked inside the alleyway in front of the 843 Garfield Street building.

MNPD Officer Warren Fleak testified that a loaded .40 caliber semi-automatic Smith & Wesson handgun was found the following day at 3:31 p.m. near the bushes in front of the elementary school. In addition, MNPD Officer Nicholas Carter testified regarding the three magazines taken from codefendant Harbison after his arrest. According to Officer Carter, two of the 9-millimeter magazines were Springfield brand, while the other was a Glock.

Forensic Scientist Bridget Chambers with the MNPD Crime Laboratory testified as an expert in the field of firearms and tool mark identification. Ms. Chambers created a firearms report summarizing the evidence associated with each shooting scene. She determined that an unknown 9-millimeter handgun had been fired at all three shooting locations—it was responsible for four casings at the first scene, eleven casings at the second, and two at the third. The Springfield 9-millimeter found on codefendant Harbison was responsible for nine casings discovered at the second shooting and fifteen at the third scene. The .40 caliber Smith & Wesson found in the bushes in front of the elementary school was responsible for four casings at the third scene. No weapon was located that matched either the ten .40 caliber casings or the seven .25 caliber casings found at the scene of the first shooting.

Ms. Chambers testified that the bullet removed from Mr. King's body was sufficient for comparison analysis. She was able to determine that it was "a .35 caliber [.]38 class bullet fired in a firearm having six polygonal lands and groves with a right twist." She explained that neither .25 caliber nor .40 caliber are in the .38 class family of calibers. Accordingly, the bullet could not have been fired through either the unidentified .25 caliber or .40 caliber firearms. Regarding the two recovered firearms, Ms. Chambers was able to exclude both the Springfield 9-millimeter handgun found on codefendant Harbison and the .40 caliber Smith & Wesson found in the bushes in front of the elementary school as the firearm that fired the bullet that killed Mr. King. However, she opined that the bullet removed from Mr. King's chest "could have been fired" from the unidentified 9-millimeter handgun.

Over a period of several days, MNPD Crime Scene Investigator Charles Linville processed the white 2000 Dodge Stratus that belonged to Mr. Fite's mother. He said that when he first began processing the car, all four of the windows were rolled up. Investigator

Linville said that he observed several strike marks to the back of the car, specifically on its bumper and trunk, as well as a defect to its rear right taillight. There was also a bullet strike to both the driver's side door and the passenger's side door. Investigator Linville was able to determine that those bullet strikes were "going left to right" and "backwards to forward on the vehicle." Also, he noted that the front passenger's side tire was "shredded[.]"

Investigator Linville looked through the window of the front passenger door and saw a bullet strike to the front passenger seat. It did not appear that the bullet hit the dashboard. Investigator Linville testified that he placed various trajectory rods into the bullet strikes in the car "to try to show the path" of the various bullets. Investigator Linville's photographs of the various trajectory rods illustrated the bullets' paths—most of the rods were red, but the green rod which went through the front passenger's seat appeared to represent the fatal bullet. Investigator Linville also testified that these bullet strikes came from the exterior of the car, meaning they entered the car from the outside.

Cell phone records confirmed that the Defendant made outgoing calls at 7:15, 7:18, 7:20, and 7:21 p.m. Later, the Defendant made calls at 8:05, 8:26, 8:28, 8:48, and 9:05 p.m. All of these calls were placed in the vicinity of the Cheatham Place housing development.

This concluded the State's proof, and the twenty-seven-year old Defendant testified on his own behalf. According to the Defendant, he worked as security for a "pipeline" in South Dakota at the time of the shooting. He indicated that when he was off work, he would return to Nashville and stay with his girlfriend, Ms. Paris Coleman, who lived in Cheatham Place. Though the Defendant said that he received mail at her address, he agreed that his driver's license did not bear that address.

The Defendant stated that he was aware of the housing complex's rules and that he spoke with the "head maintenance man" about how long he could stay there with his girlfriend. He was told that he could only stay with his girlfriend for thirteen full days and that he must be gone by the fourteenth day. During his conversation with the maintenance man, they also checked to see if he was on MDHA's "banned list," and he was not. The Defendant explained that this list showed "everyone on [MDHA's] property that ha[d] been banned." The Defendant said that he was at Cheatham Place at his girlfriend's invitation and that no one from MDHA ever asked him to leave.

The Defendant introduced a photograph of a handgun carry permit that had been issued to him on January 27, 2017, when he was twenty-one-years old. The Defendant confirmed that he regularly carried a 9-millimeter handgun that he kept loaded with

"[h]ollow tip bullets." According to the Defendant, Cheatham Place was "gang infested," particularly by a gang he referred to as the "Rollin' 40 Crips." On the evening in question, while his girlfriend was at work, the armed Defendant was present inside Cheatham Place with codefendant Harbison, a woman named Crystal, and her two children.

The Defendant said that evening when he and codefendant Harbison went to take the trash to the dumpster, a white car swerved and tried to hit them. According to the Defendant, Mr. Fite was driving the car and Mr. King, Mr. Malik Jones, and Mr. Lorenzo Butler were passengers, along with another man whom the Defendant did not know. At that time, the Defendant only knew those individuals by their "tag names." The Defendant said that after the car tried to hit them, it slowed down, and the people inside were "[l]ooking back at [them]." When the Defendant looked in codefendant Harbison's direction, he saw codefendant Harbison holding a firearm. The Defendant said that he told codefendant Harbison to holster his weapon, and he did so.

The Defendant testified that he and codefendant Harbison were scared, so they decided to walk in the opposite direction to get away from the white car and its occupants. He said that he did not want the men to find out where he lived. As they "were walking into the curved alley," a man appeared and whistled at them. He could see that the man was armed. According to the Defendant, he recognized the man as having been the unknown passenger in the white car, and he could see that the man was armed. He and codefendant Harbison turned around and walked back down the alleyway.

The Defendant was shown multiple still photographs taken from the MDHA videos. From the pictures, he identified Mr. Jones and Mr. Butler, as well as the man that whistled at them in the alleyway who was wearing a Nike shirt. The Defendant indicated that the men were following him through the housing development that evening, though he did not know it at the time. A photograph appeared to reflect Mr. Jones "racking a firearm" at 6:59 p.m. Referencing another photograph, the Defendant said that the man wearing the Nike shirt walked between him and codefendant Harbison at 7:02 p.m. and yelled "up there" to the others that he did not "know them n-----s." According to the Defendant, "a lot more people [came] down there and talk[ed] to" them, and it was not "a friendly conversation[.]" These men instructed him and codefendant Harbison "to leave the area."

By 7:19 p.m., the Defendant and codefendant Harbison had decided to walk to Kroger. Shortly thereafter, the Defendant handed codefendant Harbison a car "key fob." The Defendant said that as they were walking and turned left on Delta Avenue, Mr. King shot at them approximately five times. The Defendant said that he did not draw his weapon but that he noticed that codefendant Harbison had. At the Defendant's direction,

codefendant Harbison returned fire. The Defendant said that he ran to his Dodge Charger to seek shelter and that codefendant Harbison fled down the alleyway. The Defendant was unable to drive away because codefendant Harbison had his car key. Thereafter, the Defendant heard gunshots coming from the direction near where codefendant Harbison had run, so he proceeded up the alleyway to check on him. According to the Defendant, it was at that time when gunfire between the two groups erupted in the alleyway. The Defendant said that neither he nor codefendant Harbison fired first but that they did return fire.

The Defendant and codefendant Harbison returned to the Dodge Charger and drove away. According to the Defendant, they drove a fairly significant distance away from Cheatham Place to give the group of men inside the alleyway time to leave, so that the Defendant could return undetected. The Defendant said that they parked the car and headed back to Cheatham Place on foot, which was about a thirty- to forty-five-minute walk from their location. They intended to meet the Defendant's girlfriend at the bus stop when she returned home from work. As they neared the Garfield Street entrance to the alleyway, the Defendant saw the same white car that had tried to hit them earlier. According to the Defendant, both passenger's side windows were rolled down, and Mr. King yelled "Rollin' 40 Crip" and began shooting at them. The Defendant believed that Mr. King was firing his revolver less than ten-feet away from them. The Defendant indicated that Mr. Jones was also inside the white car, sitting in the backseat on the passenger's side behind Mr. King. The Defendant admitted that he returned fire with his 9-millimeter handgun, firing only "hollow point bullets." As the car pulled away, the Defendant saw a "muzzle flash from the back seat." The Defendant denied knowing whether anyone had been shot.

Relative to the third shooting, the Defendant said he and codefendant Harbison were walking down 9th Avenue North to meet the Defendant's girlfriend. According to the Defendant, his girlfriend was "terrified" from the evening's events, and she was bringing him his belongings because he could no longer stay with her. As he and codefendant Harbison were walking, they encountered "[a] pack of people on the opposite side of the street." He said that the group started telling them to leave because this was "their hood and stuff like that." However, the Defendant and codefendant Harbison continued walking to meet the Defendant's girlfriend. The Defendant recounted that around 9:01 p.m., three men from the group crossed the street toward a recently parked car. According to the Defendant, the driver opened the car door and handed one of the other men a firearm. The Defendant said that neither he nor codefendant Harbison had their weapons drawn at that time. One of the men next to the car then fired at codefendant Harbison from a "crouched" position. Codefendant Harbison returned fire. When shots were fired, the car drove away. One man fled in the same direction as the car, running up the street. The Defendant said that he attempted to separate himself from codefendant Harbison, but as he did so, the

- 14 -

"crouched" individual, who was now in front of the school, started shooting at the Defendant. The Defendant, now situated in front of the MDHA main office building, said that he returned fire only after being shot at first. The Defendant ran the opposite way, and that was when he and codefendant Harbison lost contact with each other.

Ultimately, the Defendant stayed with his girlfriend in Cheatham Place that evening. Thereafter, the Defendant received a telephone call from codefendant Harbison, who informed the Defendant that he had been arrested and asked the Defendant to post his bond. The Defendant admitted that he went to the booking facility at 4:00 a.m. and posted codefendant Harbison's bond. The Defendant returned to his job in South Dakota the next day. Though he kept in touch with codefendant Harbison, the Defendant claimed that he did not learn of Mr. King's death until he was arrested in May 2018, fourteen months later. The Defendant believed Mr. Jones shot and killed Mr. King from inside the car. The Defendant denied being a member of any gang.

On cross-examination, the Defendant was asked if he was aware of MDHA's "strict rules," and he said that he was. When the Defendant was asked if he knew that he could not be on the property unless he lived there or was with a person who lived there, he said "that's not necessarily true." The prosecutor asserted, "That is the rule." The Defendant then said, "No, sir." The Defendant explained that his girlfriend had talked with the leasing office, that she was also told about the thirteen-day rule, and that they complied with this rule.

When asked where his Glock 9-millimeter handgun that he carried that evening was currently located, the Defendant stated that when he left for South Dakota after his girlfriend made him leave her residence, he left his weapon in a friend's car. He said that the friend's car had since been stolen. The Defendant denied speeding over the Jefferson Street bridge at eighty miles per hour after picking up codefendant Harbison from jail.

On redirect, the Defendant persisted that he "didn't feel like a trespasser" on MDHA's property and that he did not think he was trespassing.

Following the conclusion of proof, the jury convicted the Defendant of second degree murder of Mr. King as a lesser included offense of first degree premeditated murder; second degree murder of Mr. King as a lesser included offense of first degree felony murder; attempted second degree murder of Mr. Fite as a lesser included offense of attempted first degree murder; employing a firearm during the commission of or attempt to commit a dangerous felony; and criminal trespass, a lesser included offense of

aggravated criminal trespass. *See* Tenn. Code Ann. §§ 39-12-101, -13-210, -14-405, -17-1324.

At the subsequent sentencing hearing, the Defendant's family members—both his mother, Neekla Hall-Cunningham, and his cousin's husband, Jacques Jackson—testified on the Defendant's behalf. After considering the proof, the trial court imposed sentences of twenty years at one-hundred percent for the second degree murder convictions, which were merged; nine years at thirty percent for the attempted second degree murder conviction; six years at one-hundred percent for the employing a firearm conviction; and thirty days for the criminal trespass conviction. The trial court ordered all sentences to run consecutively, except for the criminal trespass sentence which was to be served concurrently with the second degree murder sentence, resulting in an effective sentence of thirty-five years' incarceration.

The Defendant filed a timely motion for new trial, which was followed by the filing of an amended motion for new trial presenting similar issues to those raised in this appeal. Following the denial of his motion for new trial, the Defendant filed a timely notice of appeal. The case is now before us for our review.

## II. ANALYSIS

### A. Waiver Principles

Our supreme court has recently reemphasized that "an appellate court's authority 'generally will extend only to those issues presented for review.'" *State v. Bristol*, 654 S.W.3d 917, 923 (Tenn. 2022) (quoting Tenn. R. App. P. 13(b)); *see also Hodge v. Craig*, 382 S.W.3d 325, 334-35 (Tenn. 2012). This "principle of party presentation" is a defining feature of our adversarial justice system. *Bristol*, 654 S.W.3d at 923 (quoting *United States v. Sineneng-Smith*, 590 U.S. ---, 140 S. Ct. 1575, 1579 (2020)). It rests on the premise that the parties "know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Id.* at 923-24 (quoting *Sineneng-Smith*, 140 S. Ct. at 1579). "In our adversarial system, the judicial role is not to research or construct a litigant's case or arguments for him or her, but rather to serve as arbiters of legal questions presented and argued by the parties before them[.]" *Id.* (internal quotations omitted). Accordingly, an appellate court "may decline to consider issues that a party failed to raise properly." *Id.* (quoting *State v. Harbison*, 539 S.W.3d 149, 165 (Tenn. 2018)).

Moreover, "an appellate court's jurisdiction is 'appellate only.'" *Bristol*, 654 S.W.3d at 925 (quoting Tenn. Const. art. VI, § 2). "It extends to those issues that have

been formulated and passed upon in some inferior tribunal." *Id.* (quotation omitted). "Like the party-presentation principle, preservation requirements further values fundamental to our justice system." *Id.* Issue preservation principles ordinarily require that the party should first assert a timely objection during the trial court proceedings identifying a "specific ground of objection if the specific ground was not apparent from the context." *See* Tenn. R. Evid. 103(a)(1); Tenn. R. Crim. P. 51(b). Subject to certain exceptions in Tennessee Rule of Appellate Procedure 13(b), "issues are properly raised on appeal . . . when they have been raised and preserved at trial and . . . when they have been presented in the manner prescribed by" certain procedural rules regarding appellate briefs. *Hodge*, 382 S.W.3d at 334 (footnote omitted).

The Tennessee Rules of Appellate Procedure and the Rules of the Court of Criminal Appeals set forth rules regarding appellate practice, specifically, the form and contents of a party's brief. Tennessee Rule of Appellate Procedure 27(a)(7) requires an appellant to include in their appellate brief "[a] statement of the issues presented for review" and an argument section setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on." In addition, the rules of this court state that "[i]f a brief does not substantially conform to the requirements of the Tennessee Rules of Appellate Procedure, the court may order the same stricken and direct the filing, within a fixed time, of a new brief" and that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10.

## B. Defendant's Appellate Brief

In order to determine which of the Defendant's issues are properly presented on appeal for our review, it is necessary for us first to examine the Defendant's brief. The Defendant begins by presenting only one issue for review in the "Statement of Issue" section of his brief: "[The] Defendant . . . killed the victim in self-defense and the trial court used an unsubstantiated trespassing claim as a pretext to introduce evidence against him. Will this [c]ourt disturb the jury's guilty verdict on appeal and reweigh the evidence in favor of [the Defendant]?" Next, in the "Statement of the Case" section, the Defendant states that he is "challeng[ing] the sufficiency of the evidence to support the convictions and the severity of the sentences" on appeal. In support, he relies on (1) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), for the appellate standard of review for sufficiency of the evidence claims, and (2) *State v. Pollard*, 432 S.W.3d 851, 861-62 (Tenn. 2013), as

providing the appellate standard of review for his sentencing allegation. The Defendant then provides the factual background of the case in his "Statement of the Facts" section.

The "Argument" section ensues, which the Defendant commences by summarizing his issues as follows:

> The trial court erred in denying [the Defendant's] pre-trial Motion to Sever and allowing prejudicial evidence relating to the Criminal Trespassing allegation. It also erred in denying [the Defendant's] Motion for New Trial. Each error unfairly prejudiced [the Defendant] and tainted the legal process. Despite the errors, the facts also show that [the Defendant] did not commit any of the charged offenses. Reversal of the convictions and dismissal of all charges is the appropriate remedy.

He notes that during the motion for new trial phase, he argued that the guilty verdicts on all counts were against the weight of the evidence and that, similarly, on appeal, he is contending that the evidence was insufficient to support those convictions, again citing the *Jackson v. Virginia* standard of review. The Defendant then states that he was prejudiced by the trial court "at each step" in the proceedings: during the pretrial motion to sever, in the denial of his motion for new trial, and at trial "as the State introduced irrelevant and prejudicial video evidence of trespassing." He surmises that the trespassing offense did not occur as a matter of law, that the jury "grossly misweighed the evidence," and that he acted in self-defense.

Next, the Defendant, in separate sub-sections with headings, addresses the issues of (1) whether the trial court erred in denying his motion to sever the separate shooting episodes; (2) whether there was sufficient evidence to support his convictions; (3) whether the trial court erred by allowing the State to show video footage of the Defendant trespassing on MDHA property; (4) whether the trial court erred in admitting "video evidence related to Crime Scene 3"; and (5) whether the effect of these cumulative errors entitles him to relief.[1] Under the cumulative error heading, not as a separate sub-section, the Defendant raises a sentencing challenge.

The State responds that all of the Defendant's issues, except sufficiency of the evidence, are waived due to his failure to follow the rules for appellate briefs. *See* Tenn. R. App. P. 27; Tenn. Ct. Crim. App. R. 10. Specifically, the State contends that the Defendant's severance, sentencing, and cumulative error claims are waived because he failed to include these issues in his statement of the issues as required by the rules. As for

---

[1] For clarity and ease of review, we have reordered the Defendant's issues as stated in his brief.

the Defendant's evidentiary issues relative to the admission of certain video evidence, the State notes that the Defendant does not provide any "details about the exhibits and makes no reference to a page in the record in which these videos were introduced or if he objected to their introduction" and then submits that the Defendant's evidentiary issues are waived because they are not "supported by argument, citation to authorities, or appropriate references to the record."

We agree with the State that the Defendant's brief does not substantially conform to the requirements of the Tennessee Rules of Appellate Procedure. We will exercise our discretion and not order the brief stricken and require the filing of a new brief. *See* Tenn. Ct. Crim. App. R. 10(a); *see*, *e.g.*, *State v. Lee*, No. W2022-00626-CCA-R3-CD, 2023 WL 1956964, at *12 (Tenn. Crim App. Feb. 13, 2023) (concluding same), *perm. app. denied* (Tenn. June 7, 2023). We will, however, treat issues which are not properly designated as issues or supported by argument, citation to authorities, or appropriate references to the record as waived. *See* Tenn. Ct. Crim. App. R. 10(b); *Lee*, 2023 WL 1956964, at *12.

### C. Motion to Sever

In one sub-section of his argument, the Defendant argues that the trial court erred in denying his pretrial motion to sever. First, the Defendant starts by observing that the three crime scenes in this case were "at different geographic locations, occur[red] at different times, and ha[d] alleged different actors." Citing to the "State's Response to Defendant's Motion to Sever Counts" contained in the technical record, the Defendant notes that the State argued "the scenes [were] linked by the 'commonalities' of finding similar bullet casings at the different scenes." Next, in support of his assertion of error, the Defendant contends, "The evidence in this case shows that [the Defendant] did not commit the alleged criminal trespass, and the State's case was so weak they dropped the trespassing charge after playing the prejudicial video before the jury." The Defendant continues, "The video was so prejudicial that any and all evidence relating to trespassing tainted the jury as they considered the allegations against [the Defendant] involving Scene 2 and Scene 3."

The State argues the Defendant has waived his severance issue on appeal because it is not included in the Defendant's statement of the issues presented for review as required by Tennessee Rule of Appellate Procedure 27(a)(4). The Defendant does not present this issue in his "Statement of the Issue" section of his brief. He does, however, refer to the issue in his summary at the beginning of the "Argument" section of his brief, as well as providing a separate sub-section and heading dealing with the trial court's denial of his motion for severance. Were this the only deficiency in the Defendant's brief regarding

proper presentation of this issue, we might have chosen to exercise our discretionary authority and review the issue on the merits.

However, the Defendant's brief does not contain an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" Tenn. R. App. P. 27(a)(7); *see also* Tenn. Ct. Crim. App. R. 10(b). "An issue may be deemed waived, even when it has been specifically raised as an issue, when the brief fails to include an argument satisfying the requirements" of Tennessee Rule of Appellate Procedure 27. *Hodge*, 382 S.W.3d at 335. In the Defendant's brief, there is no citation to the rules governing joinder and severance, specifically, Rules 8 and 14 of the Tennessee Rules of Criminal Procedure. Nor does the Defendant cite to any caselaw concerning this issue. Moreover, the Defendant's only reference to the record in this section is to the State's response to his pretrial motion to sever; there are no references to the lengthy severance hearing nor any mention of the specifics of the trial court's ruling in its detailed order denying the Defendant's motion.[2]

What is more, counsel for the Defendant incorrectly states in the brief that the State "dropped the trespassing charge after playing the prejudicial video before the jury"; the Defendant was, in fact, convicted of criminal trespass after the charge of aggravated criminal trespass was submitted to the jury for consideration. Counsel for the Defendant also submits that "any and all evidence relating to trespassing tainted the jury as they considered the allegations against [the Defendant] involving Scene 2 and Scene 3[.]" But, the Defendant has provided neither exhibit numbers nor reference to pages in the record in which these videos were introduced, something quite necessary given the abundance of video footage in this case.

Moreover, defense counsel fails to acknowledge the trial court's ruling following the severance hearing admitting the evidence from the scene of the first shooting for identity purposes and not specifically as it related to provide evidence of trespassing. The trial court determined that proof of the first incident would be admissible in a trial of the second and third incidents because proof of the codefendants' involvement in the first incident was relevant as to the material issue of identity in the second and third incidents

---

[2] There is one reference to the trial court's order denying the motion to sever that appears in the "Statement of Facts" section. It generally cites to the first page of the order and is merely support for the Defendant's general statement that the trial court denied his motion to sever "the case into three separate cases." We emphasize that the Defendant's argument must contain *appropriate* references to the record in support of his contentions requiring appellate relief.

and because the proof established both defendants' involvement in the first incident by clear and convincing evidence.

An appellate court's role is not to construct the Defendant's argument for him, *see Sneed v. Bd. Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010), nor can we allow the Defendant to distort the record in a way that supports an argument that is otherwise unpreserved due to a failure to follow our appellate rules. The Defendant has waived appellate review of the issue.

## D.     Sufficiency of the Evidence

The Defendant, in his "Statement of Issue" section, presents the following issue for review: "[The] Defendant . . . killed the victim in self-defense and the trial court used an unsubstantiated trespassing claim as a pretext to introduce evidence against him. Will this [c]ourt disturb the jury's guilty verdict on appeal and reweigh the evidence in favor of [the Defendant]?" Next, in the "Statement of the Case" section, the Defendant states that he is "challeng[ing] the sufficiency of the evidence to support the convictions" and relies on *Jackson v. Virginia*, 443 U.S. at 319, for the appellate standard of review for sufficiency of the evidence claims. At the beginning of the "Argument" section of the Defendant's brief, he contends that "the facts also show that [the Defendant] did not commit any of the charged offenses." He then notes that during the motion for new trial phase, he argued that the guilty verdicts on all counts were against the weight of the evidence and that, similarly, on appeal, he is contending that the evidence was insufficient to support those convictions, again citing the *Jackson v. Virginia* standard of review. He concludes that the trespassing offense did not occur as a matter of law, that the jury "grossly misweighed the evidence," and that he acted in self-defense.

Relative to the particulars of the Defendant's sufficiency argument, the Defendant, in four different sub-sections, challenges the evidence supporting his convictions for second degree murder, attempted second degree murder, and employing a firearm during the commission of or attempt to commit a dangerous felony.[3] Regarding the second degree murder convictions, the Defendant submits that "[t]he evidence overwhelming supports a

---

[3] Though the Defendant utilizes four different sub-sections to present his sufficiency argument relative these offenses, which would seemingly correspond to his four different convictions, the Defendant does not include a separate sub-section devoted to his employment of a firearm conviction. He does include two sub-sections addressing the sufficiency of the evidence for separate counts of attempted second degree murder of Mr. Fite; however, the Defendant was not convicted of two counts of attempted second degree murder, only one. He does refer to the employment of a firearm offense in several places within the various sub-sections.

simple alternative theory that exonerates" him: "the evidence indicates that [Mr. King] was shot from inside the vehicle, rather than from a distance outside of the vehicle as the State argued." He notes that the evidence showed that Mr. King "was killed with a regular bullet"; that the Defendant "exclusively fires hollow point rounds[,] . . . show[ing] that [he] was not the trigger man"; and that the medical examiner did not testify "as to the probable distance from which the victim was shot, leaving a murky picture for the jury." As for count two, the Defendant states that because he "is not guilty for the [c]ount [one] predicate felony, he cannot be guilty of [c]ount [two] for felony murder."

In this same vein, relative to the attempted second degree murder conviction, the Defendant states that Mr. Fite pushed Mr. King out of the car and onto the ground and left him there, rather than to try and get him help, and that Mr. Fite subsequently "dumped the car" and went home. He further notes that the medical examiner "testified that she could not conclude what caliber of bullet killed the victim, nor did she have any sort of alleged murder weapon to compare the bullet." The Defendant contends that this evidence "supports the theory that someone in the backseat of Mr. Fite's car shot the victim from within the vehicle, which makes it impossible for [the Defendant] to be the perpetrator."

The Defendant also submits that he acted in self-defense "when two men shot at him from Mr. Fite's car." In support of his self-defense argument, the Defendant notes that "the police suppressed investigative techniques that could exonerate" him by failing to request a gunshot residue test on Mr. King and that the medical examiner was prohibited from testifying "about whether a [gunshot] residue test could have determined whether [Mr.] King could have fired, handled, or was near a gun when it was fired upon [the Defendant] from within the car[.]"

In his various sub-sections discussing these convictions, the Defendant makes several citations to the record regarding the testimony presented at trial. As for legal support, the Defendant, in a footnote, cites to Tennessee Rule of Criminal Procedure 33(d); *State v. Carter*, 896 S.W.2d 119 (Tenn. 1995); *State v. Moats*, 906 S.W.2d 431 (Tenn. 1995); and *State v. Dankworth*, 919 S.W.2d 52 (Tenn. Crim. App. 1995). He provides no specifics as to what Rule 33 states or how it is relevant to his case. Likewise, he does not provide any pinpoint citations or holdings for these cases or argue their relevance to these facts.

As for his criminal trespass conviction, the Defendant, in a fifth sub-section, argues that he cannot be guilty as a matter of law under Tennessee Code Annotated section 39-14-405 because MDHA never advised him that "he was not welcome in Cheatham Place or any other [h]ousing [a]uthority property" and that he "properly inferred consent to enter

the property." The Defendant notes that MDHA is a government entity and that their "housing complexes are open to the general public for the commercial activity of leasing rental units." According to the Defendant, the State did not rebut the inference of consent at trial. He observes that the State did not provide any evidence that MDHA had posted "No Trespassing" signs inside the housing development, that MDHA had received any complaints resulting in charges against the Defendant or codefendant Harbison, or that the Defendant's presence substantially interfered with MDHA's use of the property. The Defendant also notes that he was at Cheatham Place visiting his girlfriend and cites to his own testimony at trial that he did not "feel like a trespasser" and that he did not think that he was trespassing.

The Defendant's sufficiency argument is not a model of clarity. He includes references to improper legal canons by asking this court to reweigh the evidence and by making assertions that the verdict was against the weight of the evidence and that the jury "grossly misweighed the evidence." He also makes a perplexing argument regarding count two, asserting that he was convicted of felony murder, when he was, in fact, found not guilty of felony murder, but guilty of the lesser included offense of second degree murder; there are no predicate felonies to second degree murder as charged to the jury in this case, *see* Tennessee Code Annotated section 39-13-210(a)(1), and his two second degree murder convictions in counts one and two were merged. Nonetheless, we conclude that the Defendant's brief adequately complies with the rules of appellate briefing to present the issue for appellate review. Accordingly, we will proceed to examine whether the Defendant's convictions were supported by sufficient evidence.

### 1.    Standard of Review

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The human atmosphere of the trial and the totality of the evidence before the court below cannot be reproduced in an appellate court, which sees only the written record.

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (internal quotations and citations omitted). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and to all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

2.   Second Degree Murder, Attempted Second Degree Murder, and Employment of a Firearm During the Commission of or Attempt to Commit a Dangerous Felony

The Defendant's sufficiency argument regarding these four convictions is two-fold: (1) he contends that someone else shot Mr. King from inside the car; and (2) he submits that, if he was the shooter, he acted in self-defense. The State argues that the proof at trial established that the Defendant and codefendant Harbison fired repeatedly at Mr. Fite and Mr. King as they were riding in their car and that one bullet struck Mr. King, killing him. As for the Defendant's claim of self-defense, the State asserts that the jury listened to Mr. Fite's account, and by its verdict, chose not to believe that the Defendant acted in self-defense. Accordingly, the State submits that the evidence was sufficient to support the Defendant's convictions.

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Second degree murder is a "result of conduct" offense. *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person

- 24 -

acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). In other words, "the State is not required to prove that the defendant wished to cause his victim's death but only that the defendant knew that his or her actions were reasonably certain to cause the victim's death." *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010).

Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). Attempted second degree murder, therefore, requires the State to prove that the Defendant knew that his actions were reasonably certain to cause the victim's death and that he took a substantial step toward doing so.

To convict the Defendant of employing a firearm during the commission of or attempt to commit a dangerous felony, the State had to show that the Defendant intentionally, knowingly, or recklessly employed a firearm during the commission of or attempt to commit a dangerous felony. *See* Tenn. Code Ann. § 39-17-1324(b); *State v. Duncan*, 505 S.W.3d 480, 488 (Tenn. 2016) (quoting *State v. Fayne*, 505 S.W.3d 362, 369-70 (Tenn. 2014)). Attempt to commit second degree murder is a dangerous felony. *Id*. § 39-17-1324(i)(1)(B). The term "employ" means "to make use of." *Fayne*, 451 S.W.3d at 370.

#### a. Identity

To summarize the Defendant's argument in this regard, the Defendant insists that when "[v]iewed as a whole, the evidence indicates that [Mr. King] was shot from inside the vehicle, rather than from a distance outside of the vehicle[.]" The Defendant takes issue with the ballistics testimony, noting that Mr. King was killed with "a regular bullet," and that only regular bullets were collected from the scene, but that he exclusively uses hollow point rounds. He also takes issue with the medical examiner's testimony, noting that she did not testify as to the probable distance from which Mr. King was shot, that she could not conclude what caliber of bullet killed the victim, and that she did not have any alleged murder weapon with which to compare the bullet. In addition, the Defendant submits that Mr. Fite's abandonment of Mr. King and the car and Mr. Fite's subsequent flight from the scene is supportive of the Defendant's theory that someone else shot Mr. King from inside the car.

The Defendant's argument that someone else from inside the car shot and killed Mr. King amounts to a claim of innocence that the State failed to prove his identity as one of the perpetrators of Mr. King's murder. The identity of the perpetrator is an essential element of any crime. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing *White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975)). Identity is a question of fact for the jury's determination upon consideration of all competent proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). As with any sufficiency analysis, the State is entitled to the strongest legitimate view of the evidence concerning identity contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *See id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)); *see also State v. Miller*, 638 S.W.3d 136, 158-59 (Tenn. 2021).

The Defendant's characterization of the testimony from various State's witnesses is somewhat contorted. For instance, the Defendant criticizes testimony from Dr. Dennison, the medical examiner, stating that she failed to testify about the probable distance from which Mr. King was shot, resulting in a "murky picture for the jury." However, Dr. Dennison indicated that there was no soot or stippling seen on Mr. King's body, which meant that the bullet was fired at an "indeterminant range." Dr. Dennison explained that this meant that the victim and shooter could have been anywhere between two feet to one hundred feet apart. She also allowed that the muzzle could have been within two feet of Mr. King's body when fired, so long as there was an intermediary target between the two to absorb the soot and stippling. Thus, she provided testimony regarding the estimated range of fire to the best of her ability within the framework of the obtainable information. The jury, as the sole arbiter of fact, was free to accredit or discount any portion of her testimony. *See State v. Winters*, 137 S.W.3d 641, 658 (Tenn. Crim. App. 2003) (concluding that "the jury's role as the trier of fact is to determine which portions of the evidence are illustrative of the truth relative to disputed events").

The Defendant further claims that Dr. Dennison was unable to "conclude what caliber of bullet killed the victim, nor did she have any sort of alleged murder weapon with which to compare the bullet." However, Dr. Dennison testified that she recovered a projectile from the left side of Mr. King's chest and that it was sent for testing. While testifying about the range of firing, Dr. Dennison stated that she did not know the "quality [of] the ammunition" that killed Mr. King. Beyond that, Dr. Dennison was never asked about the caliber of the projectile recovered from inside Mr. King or whether the projectile was ever compared with any particular firearm. Importantly, as a medical examiner, Dr.

- 26 -

Dennison's area of expertise was forensic pathology, and the testimony described by the Defendant was better suited for someone with training and expertise in ballistics.

In fact, Bridget Chambers was qualified as an expert in firearm and tool mark identification and testified regarding the caliber of the bullet removed from Mr. King's body and that there was no matching firearm found. She was able to determine that the bullet was "a .35 caliber [.]38 class bullet fired in a firearm having six polygonal lands and groves with a right twist." She explained that the .38 class is a family of calibers which includes neither .25 caliber nor .40 caliber. Accordingly, she opined that the bullet could not have been fired through either the unidentified .25 caliber or .40 caliber firearms. She was also able to compare the bullet with the Springfield 9-millimeter and the .40 caliber Smith & Wesson handguns submitted for testing and determined that the bullet was not fired through either of those weapons. She opined that the bullet removed from Mr. King's chest "could have been fired" from the unidentified 9-millimeter handgun.

Moreover, Investigator Linville testified that he observed several strike marks to the back of the white Dodge Stratus, that the bullet strikes came from the exterior of the car, and that the bullet strikes were "going left to right" and "backwards to forward on the vehicle." Investigator Linville also saw a bullet strike to the front passenger seat but no corresponding strike to the dashboard. Investigator Linville placed various trajectory rods into the bullet strikes in the car, including the green rod representing the fatal bullet, and those photographs were entered into evidence.

The Defendant also condemns Mr. Fite's behavior following the shooting and implies that it indicates a guilty conscience. The jury heard Mr. Fite, who was sixteen years old at the time shooting, explain his actions following the shooting. They also heard testimony that Mr. Fite cooperated with authorities in the aftermath of the shooting by speaking with Det. Kulp on two occasions. It was within the exclusive province of the jury to determine how to weigh this evidence and what significance to attach to it, if any. *See Bland*, 958 S.W.2d at 659.

The Defendant relies on his own testimony as proof of his innocence. He submits that he "exclusively used hollow point bullets and the recovered bullets were regular." None of the witnesses tasked with crime scene investigation were asked about the regular versus the hollow point nature of the bullets or how that might have related to the cartridge casings collected. Ms. Chambers was not asked to distinguish between regular and hollow point ammunition or any distinctive characteristics between the two. The medical examiner was not asked about how a hollow point bullet might have differently impacted Mr. King's injuries. The Defendant's testimony in this regard, even if it were fully

accredited by the jury, is entirely unsupported by other evidence in the record that would have allowed the jury to reach his desired conclusion.

Video evidence from the MDHA cameras placed the Defendant and codefendant Harbison in the area of the first shooting. Cell phones records confirmed that the Defendant was using his cell phone at the times associated with his usage as depicted in the video footage. At approximately 7:30 p.m., the defendants can be seen in the alleyway firing their weapons at a group of individuals at the end of the alleyway near Garfield Street. After firing, the Defendant and codefendant Harbison ran in the opposite direction toward the other end of the alleyway and entered the Defendant's Dodge Charger parked on Delta Avenue, and the car is driven away.

While no camera angle specifically captured the homicide, surveillance video did show Mr. Fite and Mr. King in a Dodge Stratus at 8:17 p.m. as they crossed over Delta Avenue and drove through the alleyway headed toward Garfield Street just prior to the shooting. Mr. Fite testified that he saw two men on the sidewalk to the right-side of the car as they were coming toward the end of the alleyway and that as they began to turn left off the alleyway onto Garfield Street, the two men on the sidewalk opened fire on them. The 911 call by Mr. Fite was placed shortly thereafter.

At trial, Mr. Fite testified that no one else was inside the Dodge Stratus. Mr. Fite also told Det. Kulp that no one else was inside the car. The following day, Mr. Fite was shown photographic lineups and positively identified codefendant Harbison as one of the shooters and partially identified the Defendant as the other.

Around 9:00 p.m. that evening, MDHA cameras again captured the defendants on 9th Avenue North. The defendants approached a group of individuals as they were walking in front of Buena Vista Elementary School. Codefendant Harbison stepped into the street and opened fire on the group. The Defendant was then seen in front of the MDHA main office building firing at one of the men as he ran. Codefendant Harbison was apprehended shortly thereafter still inside Cheatham Place.

Once in custody, codefendant Harbison phoned the Defendant fourteen times, and the Defendant posted codefendant Harbison's bond. Both Det. Ford and Det. Kulp noticed the Defendant in the parking lot at the time of codefendant Harbison's release. When officers began to follow the defendants and watch their movements as the defendants left the booking facility, the Red Charger being driven by the Defendant, presumably with codefendant Harbison inside, sped away at high rate of speed.

- 28 -

The Springfield 9-millimeter handgun found on codefendant Harbison matched cartridge casings fired at the homicide scene and the scene in front of the elementary school. There were 9-millimeter cartridge casings found at all three crime scenes that matched an unidentified 9-millimeter weapon. Upon his arrest, three 9-millimeter magazines were found in codefendant Harbison's possession, two Springfield and one Glock. The Defendant was not apprehended until fourteen months later and claimed he did not know about Mr. King's death. When the Defendant was asked about what happened to the Glock 9-millimeter firearm that he carried at the time of the shootings, the Defendant claimed that he left it inside a friend's car and that the car had been subsequently stolen.

The jury was able to hear and assess the testimony from the various witnesses at trial. The jury rejected the Defendant's theory that Mr. King had been shot by someone inside the car, as was its prerogative. *See Bland*, 958 S.W.2d at 659. From the proof presented at trial, a reasonable juror could conclude that the Defendant's identity had been sufficiently established as one of the shooters who, on March 16, 2017, fired multiple bullets into the Dodge Stratus occupied by Mr. Fite and Mr. King, ultimately resulting in Mr. King's death. A jury could easily conclude that the Defendant was reasonably certain his actions would result in the deaths of the car's occupants. *See State v. Freeman*, 943 S.W.2d 25, 29 (Tenn. Crim. App. 1996) (finding sufficient evidence that the defendant acted knowingly when he fired multiple gunshots at a vehicle that he knew was occupied).

b.      Self-defense

Alternatively, the Defendant argues that the proof supports the conclusion that he acted in self-defense, thus justifying his use of force. At the time of the offense, Tennessee Code Annotated section 39-11-611(b)(2) (Supp. 2016), which governs claims of self-defense, provided as follows:

Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to justify his conduct. *Id*. Reliance on self-defense is not limited to the exact moment of the assault, but it may be considered in connection with the entirety of the events leading to the assault. *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993) (citation omitted). If proven to the satisfaction of the jury, self-defense is a complete defense to crimes of violence. *Id*. (citations omitted).

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *Ivy*, 868 S.W.2d at 727). When self-defense is fairly raised by the evidence, the State carries the burden of proof to negate the defense beyond a reasonable doubt. *See* Tenn. Code Ann. § 39-11-201(a)(3); *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020) (citation omitted). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

The Defendant claims that he "only fired shots after he was first fired upon by occupants in the car that Mr. Fite was driving[.]" According to Mr. Fite, who was sixteen at the time of the incident, he and Mr. King, who was eighteen, were driving through the alleyway when Mr. Fite saw two guys on the sidewalk who "just start[ed] shooting." Mr. Fite said it was just the two of them in the car at the time, and neither of them were armed. Multiple cartridge casings from two different 9-millimeter handguns were found on the sidewalk in the area where the defendants were seen standing. Officer Linville testified that when he began processing the Dodge Stratus driven by Mr. Fite, all four of the windows were rolled up. The weapon found on codefendant Harbison after his arrest fired nine of the cartridge casings found on the scene of the second shooting; the other, unidentified 9-millimeter, presumably carried by the Defendant, fired the other eleven cartridge casings found on the scene.

While the Defendant claimed that he was scared of various individuals inside Cheatham Place that evening, the Defendant had several opportunities to seek shelter or help from law enforcement. Instead, the Defendant chose to remain inside Cheatham Place

and shot at others for over a period of ninety minutes. He fired a semiautomatic 9-millimeter weapon at Mr. Fite and Mr. King eleven times. The Defendant relies on his own testimony that Mr. King shot at him first with a revolver; however, the jury listened to Mr. Fite's account, and by its verdict, chose not to believe that the Defendant acted in self-defense. *See Goode*, 956 S.W.2d at 527. The Defendant has failed to show that the evidence relative to justification raised a reasonable doubt as to his conduct being criminal. *See Clifton*, 880 S.W.2d at 743.

Furthermore, in support of his self-defense argument, the Defendant mentions that this defense would have been bolstered by the medical examiner's performance of a gunshot residue test on Mr. King, but the MNPD never requested one. The Defendant notes that when he attempted to ask Dr. Dennison on cross-examination if "a residue test could have determined whether [Mr.] King could have fired, handled, or was near a gun when it was fired[,]" the State lodged an objection to such testimony; the State's objection was sustained by the trial court, and he was prohibited from pursuing this line of questioning. According to the Defendant, "the trial court's failure to allow the residue questions significantly prejudiced" him.

To further emphasize the defects in the appellate brief prepared on behalf of the Defendant, we note that the reference to the record cited by the Defendant in support of this exchange occurred during the cross-examination of Det. Kulp, not the medical examiner as posited. Det. Kulp testified that a gunshot residue test was used to show if someone had recently fired a weapon and that none was performed on Mr. King's hands. Additionally, Det. Kulp was asked if it would "have been helpful" to perform a gunshot residue test on Mr. King's hands to see if he had recently fired a gun, but the State objected, arguing that no foundation had been laid to establish Det. Kulp's basis of knowledge. Though the defense was permitted to ask more questions of Det. Kulp in this regard, the objection to this specific question was ultimately sustained.

Most importantly, this an evidentiary issue that is only included within the Defendant's sufficiency of the evidence argument. It is never delineated as a separate issue presented for review. And, he does not include any argument or citation to authority regarding this alleged trial court error. Accordingly, to the extent that this can be viewed as a separate claim regarding the trial court's sustaining the objection, it is waived. *See* Tenn. R. App. P. 27; Tenn. Ct. Crim. App. R. 10.

For all of these reasons, we conclude that the evidence was sufficient to support the Defendant's convictions for second degree murder, attempted second degree murder, and

employing a firearm during the commission of or attempt to commit a dangerous felony. The Defendant is not entitled to relief.

### 3. Criminal Trespass

In Tennessee, "[a] person commits criminal trespass if the person enters or remains on property, or any portion of property, without the consent of the owner." Tenn. Code Ann. § 39-14-405(a). "Consent may be inferred in the case of property that is used for commercial activity available to the general public or in the case of other property when the owner has communicated the owner's intent that the property be open to the general public." *Id*. It is a defense to prosecution under this section if the person reasonably believed that they had the owner's consent to enter or remain on the property, that the person's conduct did not substantially interfere with the owner's use of the property, and the person left the property upon request. *Id*. § 39-14-405(b). However, this defense is not available if the property owner has posted signs "visible at all major points of ingress to the property . . . and the signs are reasonably likely to come to the attention of a person entering the property[.]" *Id*. § 39-14-405(c).

To summarize the Defendant's argument, he contends that he properly inferred consent to enter Cheatham Place and that the State failed to rebut this inference at trial. Specifically, he notes that the housing complex was open to the general public for the commercial activity of leasing rental units, that no one advised him he was not welcome on the property, and that the State did not offer any proof of "No Trespassing" signs posted on the property. The Defendant also submits that he was on the property visiting his girlfriend, Ms. Coleman, with whom he stayed intermittently.

The State responds that the Defendant did not live at Cheatham Place, but was only visiting his girlfriend, and that Officer Frei explained that the only people who are allowed to be on MDHA property were the people who lived there. The State further avers that the Defendant "agreed that he understood the housing development's rules and regulations related to guests and acknowledged that guests were not supposed to be in the development without their host[,]" that the Defendant admitted his girlfriend was not at Cheatham Place for most of the night in question, and that video surveillance showed the Defendant at several different locations within Cheatham Place without his girlfriend. The State concludes that the Defendant was in violation of the development's rules and, thus, did not have the housing authority's consent to enter.

However, the State mischaracterizes what occurred during Officer Frei's testimony at trial. When Officer Frei was asked why he charged codefendant Harbison with

aggravated criminal trespass, he responded, "He was on MDHA property, armed, and he wasn't supposed to be there. He had no residence there. He had no one with him saying he was supposed to be there, and he also didn't have a valid carry permit." Officer Frei was then asked who was "allowed to be on MDHA property[,]" and he said, "The only people allowed to be on there are people who live there or . . . ." The defense then objected, arguing that the State had failed to establish a foundation for Officer Frei's knowledge, and the trial court inquired of the State if it desired to ask more questions in that regard. Officer Frei next testified that upon codefendant Harbison's arrest, he determined that codefendant Harbison did not live in Cheatham Place. The State did not proceed with any further questioning of Officer Frei pertaining to trespassing or about Officer Frei's knowledge of the rules of Cheatham Place. In the 12:11 a.m. call codefendant Harbison made to the Defendant after codefendant Harbison had been arrested, he mentioned that he was being arrested for trespassing because he "wasn't supposed to be over there in Cheatham."

In addition, the State conflates the Defendant's testimony. The Defendant testified that when he returned from his work trips to South Dakota, he stayed with his girlfriend who lived in Cheatham Place at her invitation. The Defendant stated that he was aware of the housing complex's rules. He indicated that he had spoken with the "head maintenance man" about how long he could stay there and that his girlfriend had talked to the leasing office as well. He was told that he could not stay with his girlfriend any longer than a full thirteen days, and they complied with this rule. They also checked to see if he was on MDHA's "banned list," and he was not. The Defendant said that no one from MDHA ever asked him to leave. The Defendant indicated his awareness of MDHA's "strict rules," but he maintained he was still allowed to be on the property. The Defendant persisted that he "didn't feel like a trespasser" and that he did not think he was trespassing.

Here, the jury was charged that for the Defendant to be guilty of criminal trespass, the State had to prove the following essential elements beyond a reasonable doubt:

> One, that the defendant knowingly entered or remained on property or a portion thereof belonging to someone else; [a]nd two, that the defendant did not have the owner's effective consent to enter or remain. You may infer knowledge that the person did not have the owner's effective consent where notice against entering or remaining is given by: One, personal communication to the person by the owner or by someone with apparent authority to act for the owner; or two, fencing or other enclosure obviously designed to exclude intruders; or three, posting reasonably likely to come to the attention of intruders.

*See* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.—CRIMINAL 14.05 (26th ed. 2022). The jury was also charged with the definition of effective consent:

> Effective consent means assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when: [(a)] induced by deception or coercion; or (b) given by a person the defendant knows is not authorized to act as an agent; or (c) given by a person who, by reason of youth, mental disease or defect, or intoxication, is known by the defendant to be unable to make reasonable decisions regarding the subject matter; or (d) given solely to detect the commission of an offense.

*See id*.

Officer Frei only testified about the details of why codefendant Harbison was arrested for trespassing. Once the defense objected to the question of whether Officer Frei knew who was allowed to be on MDHA property, the trial court implicitly sustained the objection for lack of a foundation. Thereafter, the State never attempted to establish the foundation of Officer Frei's basis of knowledge of MDHA's rules and did not pursue any further questioning of Officer Frei along those lines. Despite the Defendant's testifying that he was aware of MDHA's "strict rules," he continued to assert his belief that he was allowed to be on the property based upon his conversation with the "head maintenance man" and his girlfriend's conversation with the leasing office. The State never entered evidence of any kind regarding the exact nature of MDHA's rules. Certainly, the prosecutor's affirmation at trial of the substance of a specific MDHA rule—"That is the rule"—was not sufficient. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) (citations omitted) (stating that remarks by counsel are not properly considered as evidence).

Cheatham Place is a housing complex, commonly open to the public. *See State v. Ash*, 12 S.W.3d 800, 806 (Tenn. Crim. App. 1999) ("Absent evidence to the effect that the defendant knew that the letter barred him from entering Authority property, i.e., showing that being placed on the list as 'served' reliably means that the person, including the defendant, has been told the contents of the letter, there is insufficient evidence that the defendant knew that he did not have the owner's effective consent to be on the property."); *cf. State v. Grimes*, No. M2001-02385-CCA-R3-CD, 2002 WL 1885053, at *3 (Tenn. Crim. App. Aug. 16, 2002); *State v. Lillard*, No. 01C01-9602-CC-00051, 1997 WL 67906, at *4 (Tenn. Crim. App. Feb. 12, 1997). Therefore, the State was required to prove that the Defendant lacked consent to be on housing authority property; however, the State failed

to offer any evidence of MDHA's rules or its lack of consent, such as signage or fencing or that the Defendant had ever been asked to leave the premises and not return. Accordingly, we are constrained to conclude that the State failed to prove the elements of criminal trespass beyond a reasonable doubt. *See Ash*, 12 S.W.3d at 806. The Defendant's conviction for criminal trespass must be reversed and dismissed.

### E.      Video Evidence

#### 1.      Video of Defendant Trespassing

In another sub-section, the Defendant argues that the trial court erred by allowing the State to introduce evidence of the Defendant trespassing on MDHA property. Here, the Defendant submits that the trial court erred because "it was factually impossible for [the Defendant] to have committed criminal trespassing," and the jury should not have been presented with any evidence related to this charge. The Defendant asserts that "the video of [him] at Cheatham Place on the night of the crime[,]" prejudiced "him on all charges" because it "tainted the jury's view of [him] by framing him as a trespasser[.]"

The Defendant's one-paragraph allegation is not supported by argument, citation to authorities, or appropriate references to record. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b). The Defendant does not mention *any* legal principle in this paragraph, much less cite to a particular rule, statute, or case. Moreover, the Defendant does not refer to any particular crime scene or cite to any exhibit or page number concerning the evidence or video to which he is referring. Again, there was an abundance of video footage from the MDHA surveillance cameras that was admitted at trial. Also, the Defendant never lodged any specific objection at trial to certain evidence or video of trespassing as being prejudicial. *See* Tenn. R. Evid. 103(a)(1); Tenn. R. Crim. P. 51(b); *see also State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020) (stating that the party who wishes to raise an issue on appeal first has an obligation to preserve that issue by raising a contemporaneous objection in the trial court).

Finally, the Defendant's argument in this regard comingles his sufficiency argument with an evidentiary issue regarding admission of evidence. Even though the Defendant's argument holds true that the State failed to present sufficient evidence at trial to establish the offense of criminal trespass, such does not retrospectively make all evidence relevant to the State's attempt to establish the charged offense inadmissible and require reversal.

### 2.    Video of "Crime Scene 3"

The Defendant, in a separate sub-section, contends that the trial court erred by admitting "video evidence related to Crime Scene 3," which prejudiced him "for the entire proceeding."  In this sub-section, the Defendant cites to Tennessee Rule of Evidence 403, arguing that the probative value of the video was outweighed by the danger of unfair prejudice.  He states that the video had no probative value because all of the charges "relative to scene 3 were ultimately dismissed before jury selection" and that the trial court, therefore, should have excluded the video under Rule 403.  The Defendant continues, "[He] had consent to be in Cheatham Place and there was no relevant fact in issue for the video to prove."  According to the Defendant, "the video was merely a pretext to open the door to other evidence of [his] activities on the night in question."  The Defendant concludes that because the video implicated him "in unrelated alleged crimes, it had a substantial danger of unfair prejudice."

The Defendant's argument in this sub-section is similarly flawed as those above.  First, though the Defendant cites to Tennessee Rule of Evidence 403, he fails to make any reference to the record in support of his argument.  *See* Tenn. R. App. P. 27(a)(7).  Moreover, the Defendant never lodged any specific objection at trial to the video evidence from the third shooting as being prejudicial under Rule 403.  *See* Tenn. R. Evid. 103(a)(1); Tenn. R. Crim. P. 51(b); *see also Vance*, 596 S.W.3d at 253.  Importantly, an appropriate legal analysis of admission of evidence implicating a defendant "in unrelated alleged crimes" would include citation to Tennessee Rule of Evidence 404, which deals specifically with character evidence, a reference not made by the Defendant.

The trial court, at the motion to sever hearing, addressed the issue of admissibility of evidence of the third shooting in a trial of the second shooting, though the Defendant makes no mention of the severance hearing or the trial court's ruling in this sub-section.  At the motion to sever hearing, the trial court, analyzing Rule 404(b), determined that the evidence from the third shooting was relevant for identity purposes without specific differentiation of its relevancy solely for proof of the trespassing charge.  The trial court, noting that identity would be an overriding concern at trial, determined that the defendants' involvement in the third incident would be probative in a trial of the second incident because shell casings from codefendant Harbison's weapon were linked to both scenes and because the recovered video from the third incident showed two individuals firing handguns in a location close to the second incident approximately forty-five minutes after that incident.  Then, the trial court found that the probative value of proof of the third incident in a trial of the second was not outweighed by its prejudicial effect because Mr. Fite's positive identification of codefendant Harbison and tentative identification of the

Defendant and the linkage between the shell casings at the scenes of the two shootings were "highly probative" of the Defendant's identity.

Additionally, we note that in the sub-section above dealing with severance, the Defendant challenges video evidence from the scene of the first shooting as providing prejudicial evidence of trespassing; but, quizzically, in the argument for this sub-section, he similarly challenges video evidence from the third shooting as prejudicial evidence of trespassing. It is unclear if this merely a scrivener's error or if there is some distinction to be drawn between the various arguments relative to the video footage from the two scenes.

The inconsistencies in and irreconcilable nature of the Defendant's various arguments in his appellate brief pertaining to evidence of trespassing are clear. The Defendant's evidentiary challenges to the video evidence are waived.

### F. Cumulative Error and Sentencing

In his final sub-section, the Defendant argues that he "was denied a fair trial by the combination of all the foregoing errors." In addition, the Defendant, in this same sub-section, without a separate heading, submits that the trial court erred in sentencing him. The State correctly notes that the Defendant has failed to raise these issues in the statement of the issues presented for review, raising them, instead, for the first time in the "Argument" section of his brief. *See* Tenn. R. App. P. 27(a)(4). Again, were this the only deficiency in the Defendant's brief regarding proper presentation of these two issues, we might have chosen to exercise our discretionary authority and review them on the merits.

#### 1. Cumulative Error

Relative to the Defendant's "combination of errors" argument, the Defendant restates his various arguments for trial court error, including a claim of insufficient evidence, and concludes that "the combination of the errors enabled the jury to reach a verdict against the weight of the evidence." However, the Defendant has not clearly set forth the applicable standard for cumulative error relief. He does not ever use the words cumulative error, include a citation to any authority, or specifically argue how cumulative error principles entitle him to relief. For these reasons, the issue is waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); *see also State v. Moore*, W2001-01664-CCA-R3-CD, 2002 WL 1732333, at *2 (Tenn. Crim. App. Apr. 2, 2002).

We also observe that, for the reasons stated above, we have waived all of the Defendant's issues except one—sufficiency of the evidence. The cumulative error doctrine

applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To that end, more than one actual error in the trial court proceedings must exist before the cumulative error doctrine can apply. *Id.* at 77. A sufficiency of the evidence claim does not lend itself to cumulative error relief because it involves no error "committed in trial proceedings" that impacted the jury's verdict; rather, it merely challenges whether that verdict was supported by sufficient evidence. Therefore, due to the inadequacies in the Defendant's brief, he would be unable to show multiple instances of trial court error adequate to warrant reversal under the cumulative error doctrine. *See State v. Bonner*, No. W2007-02409-CCA-R3-CD, 2009 WL 1905420, at *7 (Tenn. Crim. App. July 2, 2009) (citation omitted) (observing that "challenges to the sufficiency of the evidence coupled with the allegation of a single error does not amount to cumulative error")).

## 2. Sentencing

Relative to the Defendant's sentencing allegation, in the "Statement of the Case" section the Defendant asserts that he is challenging the severity of the sentences imposed and cites to *Pollard*, 432 S.W.3d at 861-62, as providing the appellate standard of review for his sentencing allegation. In *Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. 432 S.W.3d at 859.

In the Defendant's "Argument" section, he first refers to any sentencing contention in the sub-section dealing with cumulative error; nowhere in the brief is the Defendant's sentencing claim specifically delineated as a stand-alone issue. Regarding his sentencing error claim, he contends that the trial court misapplied statutory sentencing factors, "ignored the fact that [the Defendant was] a first-time offender," and gave little weight to the Defendant's "contrite allocution." The Defendant further avers that the trial court disregarded sentencing hearing testimony from Ms. Hall-Cunningham and Mr. Jackson, citing the transcript of the sentencing hearing on the whole. The Defendant concludes that the trial court's "[f]ailure to consider these factors is a violation of the Sentencing Act and shows that [the Defendant's] sentence is illegal as a matter of law."

The Defendant's one-paragraph allegation in the "Argument" section does not include any argument, citation to authorities, or appropriate references to record. *See* Tenn. R. App. P. 27(a)(7). The Defendant does not present any specific sentencing argument in this paragraph, much less cite to a particular rule, statute, or case. As for references to the

record, he cites to the sentencing hearing transcript on the whole without reference to specific testimony from a witness, argument by either party, or particulars of the trial court's ruling. We emphasize that the Defendant's argument must contain *appropriate* references to the record in support of his contentions requiring appellate relief.

To address the legality of the Defendant's sentence in this case would require us to construct the Defendant's entire sentencing argument for him, which is not our role. *See Bristol*, 654 S.W.3d at 923-24. In light of the Defendant's failure to properly present this issue for our review, we conclude that he has waived appellate review of his sentencing. *See*, *e.g.*, *State v. Jackson*, No. M2012-00828-CCA-R3-CD, 2013 WL 5675466, at *11 (Tenn. Crim. App. Oct. 17, 2013) (concluding same).

## III.    CONCLUSION

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed with respect to the Defendant's convictions for second degree murder, attempted second degree murder, and employing a firearm during the commission of or attempt to commit a dangerous felony. The Defendant's conviction for criminal trespass is reversed and dismissed, and the case is remanded to the trial court for entry of an amended judgment form reflecting the dismissal.

_____
KYLE A. HIXSON, JUDGE